RENDERED: AUGUST 22, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0197-DG

JONATHAN HARDIN                                                APPELLANT

|  |  |
|---|---|
| V. | ON REVIEW FROM COURT OF APPEALS<br>NO. 2021-CA-0234<br>JEFFERSON CIRCUIT COURT NO. 19-CI-000858 |

LOUISVILLE/JEFFERSON COUNTY                            APPELLEES
METROPOLITAN GOVERNMENT; AND
LOUISVILLE METRO POLICE MERIT
BOARD

## OPINION OF THE COURT BY JUSTICE KELLER

### AFFIRMING

Jonathan Hardin was terminated from his employment with the Louisville Metro Police Department (LMPD) after the Chief of Police determined that he had committed four violations of police department Standard Operating Procedures (SOPs). Hardin appealed his termination to the Louisville Metro Police Merit Board (the Merit Board). The Merit Board concluded that Hardin had committed three of the four SOP violations that the Chief had found and upheld Hardin's termination. Hardin then appealed to the Jefferson Circuit Court, which affirmed the Merit Board's decision. He then appealed to the Court of Appeals, which affirmed the Circuit Court. This Court granted

Hardin's Motion for Discretionary Review, and after a thorough review of the record and the law, we affirm the Court of Appeals.

## I. BACKGROUND

Hardin was employed by LMPD in 2015 and was assigned to serve as a school resource officer (SRO) at Frederick Law Olmsted Academy North, a school that staff members have described as "tough." On January 22, 2015, Hardin was involved in an altercation with a 13-year-old student, Shavez Pearson, during which he struck Pearson in the face. He subsequently arrested Pearson, charging him with two public offenses, but failed to read Pearson his *Miranda*[1] rights. On January 27, 2015, Hardin was involved in another altercation with a different student, Tywon Anderson, during which he wrapped his arms around Anderson so tightly that Anderson lost consciousness. Both incidents were captured on school surveillance video.

Shortly after the second incident, both a Professional Standards Unit (PSU) investigation and a Public Integrity Unit (PIU) investigation were initiated. The PIU conducts criminal investigations of LMPD employees. The PSU conducts administrative/disciplinary investigations into possible internal policy violations by LMPD employees. During its investigation, the PIU conducted eleven witness interviews. The PIU also collected the school surveillance videos of the incidents. Once the bulk of the PIU investigation was completed, the PSU obtained copies of all of the items in the PIU file and incorporated those

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

materials into the PSU investigative file, without conducting much independent investigation. The PSU did, however, interview Hardin. Hardin was ultimately charged with criminal offenses stemming from each of the incidents.

On March 20, 2015, the Chief of Police terminated Hardin's employment with LMPD. The Chief found that Hardin committed four violations of SOPs. The Chief found that Hardin committed two violations of SOP 9.1.4, entitled "Use of Physical Force," for using more force than was reasonably necessary against both Pearson and Anderson. The Chief further found that Hardin committed one violation of SOP 10.7.2, entitled "Taking Juveniles into Custody," for failing to advise Pearson of his *Miranda* rights when taking him into custody. Finally, the Chief found Hardin violated SOP 5.1.2, entitled "Obedience to Rules and Regulations," for engaging in "conduct [that] led to [Hardin's] arrest."

Hardin appealed his termination to the Merit Board. The Merit Board reviews the Chief's disciplinary actions and, in termination cases, holds a public, evidentiary hearing. At Hardin's request, the Merit Board proceedings were abated until Hardin's criminal charges were resolved.

The criminal charges against Hardin related to the Pearson incident were eventually dismissed with prejudice. That criminal case was expunged in January 2016. In May 2018, Hardin went to trial on the criminal charges stemming from the Anderson incident, and a jury acquitted him of all charges. It does not appear that Hardin has obtained an expungement of that case. Hardin's Merit Board hearing did not take place until after both the

3

expungement and the acquittal, as previously mentioned. The hearing took place over four days during the months of August and October 2018.

Prior to the Merit Board hearing, Hardin objected to the admission of materials related to the Pearson incident that had been taken from the PIU file, arguing that those materials had been expunged. He further objected to the admission of all transcribed witness statements if the witnesses were not called to testify during the hearing and made subject to cross-examination. Although the Merit Board did not explicitly rule on Hardin's objection, it did not exclude the materials or witness statements, and thereby effectively overruled Hardin's objections.

At the Merit Board hearing, LMPD did not call any of the witnesses who made statements to the PIU to testify. Instead, LMPD only called to testify various employees of LMPD, including the investigating PSU officer, an investigating PIU officer, Hardin's supervisor, and other supervisory officers. The school surveillance videos of the incidents were played multiple times. Hardin called three witnesses to testify on his behalf who had given statements to the PIU.

At the conclusion of the hearing, the Merit Board found that Hardin committed three of the four SOP violations found by the Chief. The Merit Board found that he committed two violations of the use of force SOP and that he violated the SOP that required him to read *Miranda* rights to juveniles who are taken into custody. The Board, however, found that he did not commit the singular violation that resulted solely from the fact that he was charged

4

criminally for the incidents, the "Obedience to Rules and Regulations" SOP, "given the eventual exoneration and expungement of his criminal charges." Ultimately, the Board upheld the Chief's termination decision.

Hardin then appealed his termination to the Jefferson Circuit Court pursuant to Kentucky Revised Statute (KRS) 67C.323(3)(a) and KRS 67C.326(2). To the circuit court, Hardin made three primary arguments. First, he argued that the Merit Board erroneously considered expunged materials related to the Pearson incident. Second, he argued that his statutory and due process rights were violated when the Merit Board considered transcribed witness statements, when those witnesses did not testify at the hearing and were not subject to confrontation and cross-examination. Finally, he argued that LMPD improperly relied on his arrest and criminal charges, absent a criminal conviction, as bases for his termination. The Jefferson Circuit Court affirmed the Merit Board's order.

Hardin then appealed to the Court of Appeals, making the same arguments he made to the circuit court. The Court of Appeals also affirmed. Hardin then sought discretionary review from this Court. After initially abating his case, we granted his motion for discretionary review.

## II. ANALYSIS

To this Court, Hardin asserts the same arguments that he made to both the circuit court and the Court of Appeals. First, he argues that the Merit Board erred in failing to exclude expunged materials. Second, he argues that the Merit Board erred in considering sworn, transcribed statements of

5

witnesses who were not called to testify at the hearing and, therefore, were not subject to cross-examination. Finally, he argues that his termination was improperly based in part on his arrest and criminal charges instead of on a conviction. We review each allegation in turn.

## A. Standard of Review

"[J]udicial review of administrative action is concerned with the question of *arbitrariness.*" *Am. Beauty Homes Corp. v. Louisville & Jefferson Cty. Plan. & Zoning Comm'n*, 379 S.W.2d 450, 456 (Ky. 1964). The Circuit Court uses a "modified de novo" standard of review when reviewing actions of the Merit Board. *Crouch v. Jefferson Cnty., Ky. Police Merit Bd.*, 773 S.W.2d 461, 464 (Ky. 1988). It "allows the reviewing court to invade the mental processes of the Board to determine whether its action is not arbitrary. To determine arbitrariness, the appellate court may review the record, the briefs, and any other evidence or testimony which would be relevant to that specific, limited issue." *Id.* In reviewing for arbitrariness, the reviewing court must determine whether the questioned exercise of authority might be infirm because the action exceeded the Board's granted powers, the proceeding lacked procedural due process, or the Board's decision lacked substantial evidentiary support. *Am. Beauty Homes Corp.*, 379 S.W.2d at 456. Importantly, "[t]he appeal is not the proper forum to retry the merits." *Crouch*, 773 S.W.2d at 464.

In the case before us, all of the issues presented are questions of law. Thus, despite the above-described general standard of review, we review the

6

issues before us de novo. *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 647

(Ky. 2017).

## B. Use of Expunged Materials

Hardin argues that the Merit Board erroneously failed to exclude

expunged materials from its consideration. As previously discussed, the

criminal charges related to the Pearson incident were expunged pursuant to a

Jefferson Circuit Court order entered on January 19, 2016. That order stated,

> The above-named **offense(s) is/are expunged from the court records**. On entry of this order, the proceedings shall be deemed never to have occurred; the court shall reply to any inquiry that no record exists; and Defendant shall not have to disclose the fact of the record or any matter relating to it on an application for employment, credit, or other purpose.

(Bold in original). Regarding police and other agencies outside of the court

system, the order stated,

> **The Kentucky State Police and other following agencies** [including LMPD], with custody of records relating to the arrest, charge or other matters arising out of the arrest or charge, shall expunge the record, including but not limited to: arrest records, fingerprints, photographs, index references, or other documentary or electronic data, **and shall certify to the Court on this form within sixty (60) days** of the entry of this order that the required expunging action has been completed[.]

(Bold in original). The order was entered on a form provided by the

Administrative Office of the Courts, and its language closely tracks the

7

language of the expungement statutes. KRS 431.076[2], the expungement statute relevant to Hardin's circumstances, states in part,

> An order of expungement pursuant to this section shall expunge all criminal records in the custody of the court and any criminal records in the custody of any other agency or official, including law enforcement records, but no order of expungement pursuant to this section shall expunge records in the custody of the Department for Community Based Services. The court shall order the expunging on a form provided by the Administrative Office of the Courts. Every agency, with records relating to the arrest, charge, or other matters arising out of the arrest or charge, that is ordered to expunge records, shall certify to the court within sixty (60) days of the entry of the expungement order, that the required expunging action has been completed. All orders enforcing the expungement procedure shall also be expunged.

KRS 431.076(4). That same statute goes on to state,

> After the expungement, the proceedings in the matter shall be deemed never to have occurred. The court and other agencies shall delete or remove the records from their computer systems so that any official state-performed background check will indicate that the records do not exist. The court and other agencies shall reply to any inquiry that no record exists on the matter. The person whose record is expunged shall not have to disclose the fact of the record or any matter relating thereto on an application for employment, credit, or other type of application.

KRS 431.076(6). Notably, KRS 431.079(3) defines "expungement" as "the removal or deletion of records by the court and other agencies which prevents the matter from appearing on official state-performed background checks."

Stated simply, Hardin argues that because the entirety of LMPD's PIU file was subject to the expungement order, anything in the PSU file that came from

---

[2] KRS 431.076 has been amended multiple times since Hardin's expungement order was entered. However, all of the amendments to the relevant subsections of the statute apply retroactively. KRS 431.076(8).

the PIU file should also have been expunged and therefore excluded from the Merit Board's consideration.[3] Hardin asserts that pursuant to KRS 431.076, the records to be expunged include "law enforcement records." He further contends that the PIU investigatory file was a criminal law enforcement record, and that all PIU records had to be expunged, including those PIU records placed in the PSU file. The Louisville/Jefferson County Metropolitan Government (Metro Government) and the Merit Board, on the other hand, argue that the expungement statutes do not apply to LMPD's PSU file, as it is an internal employment record.

To determine what materials should have been excluded from the Merit Board's consideration due to the expungement order, we must determine the breadth of the application of our Commonwealth's expungement statutes. "The cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *MPM Fin. Grp., Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky. 2009). "We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011) (citing *Osborne v. Commonwealth*, 185 S.W.3d 645 (Ky. 2006)). "Only if

---

[3] Hardin relies heavily on *McNabb v. Ky. Educ. Pro. Standards Bd.*, No. 2013-CA-000601-MR, 2015 WL 5096007 (Ky. App. Aug. 28, 2015). However, *McNabb* is an unpublished Court of Appeals decision and holds no weight with this Court. Regardless, *McNabb* is distinguishable because McNabb's teaching certificate was revoked based **solely** on a felony conviction which was eventually reversed and expunged, whereas Hardin's termination was not based solely on allegedly expunged materials. *Id.* at *3.

9

the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts." *Id.*

In construing a statute, we must "presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes." *Id.* Finally, "[a] well-established rule of statutory construction is that the courts will consider the purpose which the statute is intended to accomplish—the reason and spirit of the statute—the mischief intended to be remedied." *City of Louisville v. Helman*, 253 S.W.2d 598, 600 (Ky. 1952).

In this case, much of the language contained in KRS 431.076 is broad. The statute requires that "records **relating to** the arrest, charge, or other matters **arising out of** the arrest or charge" must be expunged. KRS 431.076(4) (emphasis added). The statute further provides that "[a]fter the expungement, the proceedings in the matter shall be deemed **never to have occurred**." KRS 431.076(6) (emphasis added). However, KRS 431.076 also includes language that appears to more clearly demonstrate the intent of the legislature in drafting the statute. The statute states that the records must be "delete[d] or remove[d] . . . **so that any official state-performed background check will indicate that the records do not exist**." *Id.* (emphasis added). This language, which is repeated in the specific definition of "expungement" provided by the legislature, clarifies the effect that the expungement is

10

intended to have. *See* KRS 431.079(3) ("For purposes of . . . KRS . . . 431.076 . . ., 'expungement' means the removal or deletion of records by the court and other agencies which prevents the matter from appearing on official state-performed background checks."). Accordingly, the plain language of KRS 431.076 shows the legislature's intent that expungement is meant to "prevent[] the matter from appearing on official state-performed background checks" so that "[t]he person whose record is expunged shall not have to disclose" any information related to the record.

After closely analyzing the expungement statute, we agree with Metro Government and the Merit Board that LMPD's PSU file is an internal employment file to which the expungement statute does not apply. Although the PSU file is in the possession of an agency subject to the expungement order, it is not itself a "criminal record" or a "law enforcement record" of the type contemplated by the legislature in drafting the expungement statutes. *See* KRS 431.076(4). The PSU file is, for all practical purposes, a personnel file, similar to one that would be maintained by the human resources department of any other employer. Because of this very nature, material that is contained within LMPD's PSU file will never "appear[] on official state-performed background checks" regardless of the source of that material. KRS 431.079(3). Accordingly, because information contained in the PSU file is neither a criminal record nor would it appear on a state-performed background check, we conclude that it is not subject to the expungement order. Therefore, the Merit

11

Board did not err in considering the information in the PSU file that was obtained from the PIU file.

**C. Due Process Right to Cross-Examine**

Hardin next argues that the Merit Board's consideration of sworn, transcribed witness statements of individuals who were not called to testify at the hearing and, therefore, were not subject to cross-examination, violated his Due Process rights. He asserts that these rights can be found both in the statutes that govern the Merit Board as well as in the Kentucky and United States Constitutions.

1. Statutory Due Process Rights

Hardin argues that KRS 67C.325 and 67C.326(1)(h) provide him with procedural and administrative due process rights to cross-examine witnesses against him such that the admission of transcriptions of these witnesses' prior statements was improper. The Merit Board and Metro Government, on the other hand, assert that the admission of sworn statements is contemplated, and even explicitly permitted, by the relevant statutes.

KRS 67C.325 states in full,

Procedural due process shall be afforded to any police officer brought before the board. The officer shall be given a prompt hearing by the board, **have an opportunity to confront his or her accusers**, and have the privilege of presenting the board with evidence. The board shall have the power to issue subpoenas attested in the name of its chairman, to compel the attendance of witnesses, to compel the production of documents and other documentary evidence, and so far as practicable, conduct the hearing within the Kentucky Rules of Civil Procedure. Upon a showing of proper need, **the board shall issue subpoenas to compel the attendance of witnesses**, or to compel the production

12

of documents and other documentary evidence for the benefits of the officer or the chief **at the request of the officer** or the chief.

(Emphasis added). Hardin asserts that the "opportunity to confront his or her accusers" language of KRS 67C.325 is modeled after the language of the Sixth Amendment to the United States Constitution and thus provides analogous rights. However, the Sixth Amendment provides criminal defendants with the "right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This language is markedly different from that contained in KRS 67C.325.

KRS 67C.325 makes no mention of a "right" (other than in its title), and instead, merely provides a police officer with an "**opportunity** to confront his or her accusers." The word "opportunity" is crucial in this analysis, as the remainder of that statutory section sets out how that opportunity to confront is to be provided: "[T]he board shall issue subpoenas to compel the attendance of witnesses . . . at the request of the officer." KRS 67C.325. Thus, police officers brought before the Merit Board are provided the **opportunity** to confront their accusers by requesting a subpoena be issued which compels the accuser's attendance at the hearing and then confronting the accuser through direct or cross-examination. Nothing more is required by KRS 67C.325. To interpret KRS 67C.325 in any other way would apparently result in more procedural due process rights for officers employed by LMPD than for officers employed by many other agencies within the Commonwealth.[4]

---

[4] The Police Officers' Bill of Rights, KRS 15.520, which applies to many of our Commonwealth's police officers, does not include similar "opportunity to confront"

13

We are mindful that we must "presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes." *Shawnee Telecom Res., Inc.*, 354 S.W.3d at 551. The above interpretation of KRS 67C.325 is further supported by the language contained in a related statute, KRS 67C.326(1)(h). When the two statutes are read together, it becomes even clearer that the legislature intended for sworn, transcribed witness statements to be considered by the Board even if those witnesses were not called to testify at the hearing.

KRS 67C.326(1)(h) sets forth the "minimum" "administrative due process rights" provided to police officers in proceedings in front of the Merit Board. KRS 67C.326(1)(h)2 explicitly permits the Merit Board to consider "any sworn statements or affidavits" and requires those statements to "be furnished to the police officer no less than seventy-two (72) hours prior to the time of the hearing." If the General Assembly had intended to permit the Merit Board to consider sworn statements and affidavits only if the witness was called to testify, it would have said so. We are not permitted to add words to a statute, and "a legislature making no exceptions to the positive terms of a statute is presumed to have intended to make none." *Lee v. Ky. Dept. of Corr.*, 610 S.W.3d 254, 262 (Ky. 2020) (quoting *Bailey v. Reeves*, 662 S.W.2d 832, 834 (Ky. 1984)).

---

language. However, KRS 78.460, which provides procedural due process rights to county police officers, does include similar language.

14

KRS 67C.326(1)(h) further provides that the accused police officer "may cross-examine all witnesses called by the charging party." KRS 67C.326(1)(h)7. This right is specifically and explicitly contingent upon the witness being, in fact, "called by the charging party." *Id.* Hardin asserts that the LMPD's presentation of a sworn, transcribed witness statement is tantamount to the LMPD calling that witness to testify at the hearing, which in turn, triggers his right to cross-examine the witness. We find no support for this contention in either the plain language of the statute or in our Court's precedent, and it appears to be directly contrary to KRS 67C.326(1)(h)2, which, as just discussed, allows for consideration of sworn statements and affidavits.

Like KRS 67C.325, KRS 67C.326(1)(h) also provides an accused police officer the right to request a subpoena to require the attendance of witnesses at the hearing. KRS 67C.326(1)(h)6. In order for a police officer to avail himself of the "opportunity" to confront his accuser, he may need to subpoena the witness, call him or her to testify, and then cross-examine him or her. Further, police officers are explicitly provided the right to cross-examine witnesses called by the LMPD. KRS 67C.326(1)(h)7. We find nothing in the language of KRS 67C.325 or 67C.326 which provides Hardin any greater right to cross-examine. Accordingly, the Merit Board did not violate Hardin's statutory Due Process rights in considering sworn, transcribed witness statements even though those witnesses did not testify at the hearing and were not subject to cross-examination.

15

## 2. Constitutional Due Process Rights

Hardin next argues that even if the statutes do not prohibit the Merit Board from considering sworn, transcribed statements of witnesses who were not called to testify at the hearing and therefore were not subject to cross-examination, both the Kentucky and United States constitutions do. He argues that his constitutional procedural Due Process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Section Two of the Kentucky Constitution may be greater than those provided by the statutes and were violated when the Merit Board considered sworn, transcribed statements of witnesses who were not subject to cross-examination. He further argues that the Sixth Amendment Confrontation Clause jurisprudence should inform our Due Process analysis. He does not, however, engage in a meaningful way with the *Mathews v. Eldridge* factors which, as described below, the United States Supreme Court has stated determine the contours of procedural Due Process protections. 424 U.S. 319 (1976).

"[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The property rights protected by the Due Process Clause include the right to continued employment in a merit system like that established for LMPD. *See id.* at 539, 543.

"The essential requirements of due process . . . are notice and an opportunity to respond." *Dep't of Revenue, Fin. & Admin. Cabinet v. Wade*, 379

16

S.W.3d 134, 138 (Ky. 2012) (quoting *Loudermill*, 470 U.S. at 546). The hearing at which the individual can respond "must be 'at a meaningful time and in a meaningful manner.'" *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). However, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "[W]hat may be required under [the Due Process] Clause in dealing with one set of interests which it protects may not be required in dealing with another set of interests." *Arnett v. Kennedy*, 416 U.S. 134, 155 (1974). Notably, it does not always require Sixth Amendment-like confrontation, as Hardin suggests. To hold otherwise would elevate the rights provided at a civil administrative hearing to those provided at a criminal trial where the defendant's very liberty, or even life, is at stake.

Although our Court can interpret "the Constitution of Kentucky in a manner which differs from the interpretation of parallel federal constitutional rights by the Supreme Court of the United States[,]" when we do so, it is typically "because of Kentucky constitutional text, the Debates of the Constitutional Convention, history, tradition, and relevant precedent." *Commonwealth v. Cooper*, 899 S.W.2d 75, 77–78 (Ky. 1995). When it comes to the Due Process Clause, this Court has adopted the three-factor test found in the United States Supreme Court's decision in *Mathews v. Eldridge*, 424 U.S. 319. *Trans. Cabinet v. Cassity*, 912 S.W.2d 48, 51 (Ky. 1995).

In *Mathews*, the United States Supreme Court was tasked with determining how much procedural process was due to a Social Security disability benefit recipient prior to the termination of those benefit payments. 424 U.S. at 323. In order to do so, the Court stated that

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Since then, the *Mathews* test has become the controlling test for determining how much procedural due process is required under any given set of circumstances, and we are ever mindful that "[t]he matter comes down to the question of the procedure's integrity and fundamental fairness." *Richardson v. Perales*, 402 U.S. 389, 410 (1971). Because this Court has not yet decided how much procedural process is constitutionally due a police officer before the Merit Board, we must undertake the *Mathews* analysis today.

*a. Private Interest*

The first factor to be considered in the *Mathews* test is "the private interest that will be affected by the official action[.]" *Mathews*, 424 U.S. at 335. In this case, the private interest at stake is the retention of merit employment. In *Cleveland Board of Education v. Loudermill*, the United States Supreme Court explained, "[T]he significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of

18

depriving a person of the means of livelihood." 470 U.S. at 543. That Court went on to note that "[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Id.*

So, while the private interest in retaining employment is high, it is, perhaps, not as high as the private interest at stake in other situations. For example, the United States Supreme Court noted that the private interest in retaining welfare benefits is higher than that in retaining employment because "termination of aid pending resolution of a controversy over [welfare] eligibility may deprive an eligible recipient of the very means by which to live while he waits." *Goldberg*, 397 U.S. at 264. The private interest here is also less significant than the private interest in the retention of Social Security disability benefit payments because in the case of the loss of disability benefits, "there is little possibility that the terminated recipient will be able to find even temporary employment to ameliorate the interim loss." *Mathews*, 424 U.S. at 341.

In cases such as the one before us, the private interest in retaining employment is lessened by the fact that the terminated employee has the physical ability to obtain at least temporary employment in order to mitigate some of the hardship imposed by the loss of his merit employment.

b. *Risk of Erroneous Deprivation and Probable Value of Additional Safeguards*

The second factor to be considered under the *Mathews* test is "the risk of an erroneous deprivation of such interest through the procedures used, and

the probable value, if any, of additional or substitute procedural safeguards[.]" *Mathews*, 424 U.S. at 335. Here, the additional procedural safeguard that Hardin seeks is live testimony and cross-examination of a witness whose statement the LMPD seeks to admit against an officer.

Courts have long acknowledged the "value of cross-examination in exposing falsehood and bringing out the truth" in a fact-finding endeavor. *Pointer v. Texas*, 380 U.S. 400, 404 (1965). Further, "[d]ismissals for cause will often involve factual disputes." *Loudermill*, 470 U.S. at 543. In fact, the United States Supreme Court has stated that "[p]articularly where credibility and veracity are at issue, as they must be in any [public assistance benefits] termination proceedings, written submissions are a wholly unsatisfactory basis for decision." *Goldberg*, 397 U.S. at 269. That Court went on to say that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.* Notably, however, the Supreme Court used the term "opportunity" as opposed to the term "right," and the facts of *Goldberg* are highly distinguishable from the facts before us today. In *Goldberg*, the New York City Department of Social Services procedures at issue failed to provide the opportunity for any "personal appearance of the [benefits] recipient before the reviewing official, for oral presentation of evidence, [or] for confrontation and cross-examination of adverse witnesses" prior to termination of public assistance benefits. *Id.* at 259. In our case, however, as is described below, hearings before the Merit Board include personal appearance by the officer,

20

representation by counsel, presentation of live testimony and documents, oral argument, and cross-examination of witnesses called by LMPD.

We contrast *Goldberg* with *Richardson v. Perales*. 402 U.S. 389 (1971), in which the United States Supreme Court reached a different result. In *Richardson,* the Court had to determine "whether physicians' written reports of medical examinations they have made of a disability claimant may constitute 'substantial evidence' supportive of a finding of nondisability . . . when the claimant objects to the admissibility of those reports and when the only live testimony is presented by his side and is contrary to the reports." 402 U.S. at 390. Although the Court relied heavily on the "underlying reliability and probative value" of the medical reports, its ultimate holding was as follows:

> We conclude that a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has **not exercised his right to subpoena** the reporting physician and thereby provide himself with the **opportunity** for cross-examination of the physician.

*Id.* at 402 (emphasis added). The Court noted that "the claimant complains of the lack of opportunity to cross-examine the reporting physicians, [but] he did not take advantage of the **opportunity** afforded him under [the relevant regulation] to request subpoenas for the physicians." *Id.* at 404 (emphasis added). It went on to say, "[A]s a consequence [the claimant] is to be precluded from now complaining that he was denied the rights of confrontation and

21

cross-examination." *Id.* at 405. Accordingly, despite the value of cross-examination in truth-finding, live testimony and cross-examination at a hearing is not always a prerequisite to admission of witness statements.

Hardin's hearing in front of the Merit Board is distinguishable from most, if not all, of the United States Supreme Court cases cited thus far in this Opinion in one important way. The hearing that occurs in front of the Merit Board is a post-termination hearing, meaning that the police officer whose matter the Merit Board is considering has already been terminated from his employment. The hearing before the Merit Board is the last chance for fact-finding, which is different from the cited cases that analyze pre-action hearings under statutory schemes which require a full hearing post-action. *See, e.g., Loudermill,* 470 U.S. 532. Thus, accurate fact-finding by the Merit Board is even more important.

That being said, however, the General Assembly has already provided officers with extensive procedural safeguards in matters before the Merit Board. Prior to an officer ever being terminated or going before the Merit Board, KRS 67C.321(1) requires the Chief of Police to "furnish the officer concerned with a written statement of the reasons why the described action is being taken." The officer is then "allowed a period of ten (10) days within which the officer may file a written answer to the charges and the reasons which caused her or his suspension, removal, or reduction." *Id.* If the Chief proceeds with the termination, the officer is then permitted an appeal to the Merit Board, which

"shall be heard by the full board. The board shall give notice and hold a public hearing." KRS 67C.323(1).

As previously discussed, KRS 67C.325 provides officers brought before the Merit Board certain procedural due process. Under that statute, "[t]he officer shall be given a prompt hearing by the board, have an opportunity to confront his or her accusers, and have the privilege of presenting the board with evidence." KRS 67C.325. Further, at the request of the officer, "the board shall issue subpoenas to compel the attendance of witnesses, or to compel the production of documents and other documentary evidence for the benefits of the officer[.]" *Id.*

As previously discussed, KRS 67C.326 provides officers with certain "administrative due process rights." It prohibits "threats, promises, or coercions" from being "used at any time against any police officer while he or she is a suspect in a criminal or departmental matter." KRS 67C.326(1)(b). It further mandates that

> [a]ny charge involving violation of any consolidated local government rule or regulation shall be made in writing with sufficient specificity so as to fully inform the police officer of the nature and circumstances of the alleged violation in order that he may be able to properly defend himself. The charge shall be served on the police officer in writing[.]

*Id.* at (1)(e). Finally, KRS 67C.326(1)(h) provides a long list of administrative due process rights that "shall be the minimum rights afforded any police officer charged."[5] The officer "shall be given at least seventy-two (72) hours' notice of

---

[5] The General Assembly has amended KRS 67C.326, effective January 1, 2025, in a way that is seemingly beneficial for officers. For example, officers must be given

any hearing[.]" *Id.* at (1)(h)1. He must be provided with "[c]opies of any sworn statements or affidavits to be considered by the hearing authority and any exculpatory statements or affidavits . . . no less than seventy-two (72) hours prior to the time of any hearing[.]" *Id.* at (1)(h)2.[6] The Supreme Court has recognized that a "safeguard against mistake is the policy of allowing the disability recipient's representative full access to all information relied upon by the state agency." *Mathews*, 424 U.S. at 345–46. This access is granted in Merit Board proceedings.

Additionally, if the disciplinary action was taken based on a complaint made by an individual, the Merit Board can only consider charges made by that individual if the individual appears at the hearing. KRS 67C.326(1)(h)4. Further, "[t]he accused police officer shall have the right and opportunity to obtain and have counsel present, and to be represented by counsel[.]" *Id.* at (1)(h)5.

Regarding subpoenas, the General Assembly has provided an accused police officer with the following rights:

> The appointing authority, legislative body, or other body as designated by the Kentucky Revised Statutes shall subpoena and require the attendance of witnesses and the production by them of books, papers, records, and other documentary evidence at the request of the accused police officer . . . . If any person fails or refuses to appear under the subpoena, or to testify, or to attend, or

---

twelve days' notice of a hearing and must be provided with any statements and affidavits to be considered by the Merit Board at least twelve days before the hearing. KY LEGIS 181 § 10 (2024), 2024 Kentucky Laws Ch. 181 (HB 388). This expanded time frame provides a greater opportunity to effect due process.

[6] Merit Board hearing procedures require all documents to be provided to the other side at least ten days before the hearing.

24

produce the books, papers, records, or other documentary evidence lawfully required, the appointing authority, legislative body, or other body as designated by the Kentucky Revised Statutes may report to the Circuit Court or any judge thereof the failure or refusal, and apply for a rule. The Circuit Court, or any judge thereof, may on the application compel obedience by proceedings for contempt as in the case of disobedience of the requirements of a subpoena issued from the court[.]

*Id.* at (1)(h)6. The police officer must also "be allowed to have presented, witnesses and any documentary evidence the police officer wishes to provide to the hearing authority, and may cross-examine all witnesses called by the charging party[.]" *Id.* at (1)(h)7. Finally, action taken by the Merit Board is then appealable to the circuit court, and the judgment of the circuit court can be appealed to the Court of Appeals. KRS 67C.323(3); KRS 67C.326(2), (3).

In weighing the second *Mathews* factor, we conclude that there is at least some risk of an erroneous deprivation of an officer's right to employment by allowing admission of sworn statements of witnesses who are not called to testify at the hearing and therefore are not subject to cross-examination. We further conclude that said risk would be somewhat mitigated by requiring those witnesses to appear in person and be subject to cross-examination before admitting their prior statements. *See Mathews*, 424 U.S. at 335. However, we also conclude that the right to cross-examine would likely have minimal value in accurate fact-finding because of the significant procedural safeguards already granted officers by the General Assembly, including notice of the hearing, right to counsel, access to the information relied upon by LMPD, and the right to subpoena witnesses. *See id.*

25

*c. Government's Interest*

The final *Mathews* factor that we must consider is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* The United States Supreme Court also described this factor as "the public interest," which includes "the administrative burden and other societal costs[.]" *Id.* at 347.

Metro Government asserts three primary interests to be considered under this factor: (1) maintenance of employee efficiency and discipline, (2) expeditious removal of unsatisfactory employees, and (3) avoidance of administrative burdens. These are all legitimate interests to be considered, although some weigh more heavily than others.

The maintenance of employee efficiency and discipline is an important interest to consider. However, Metro Government does not explain how employee efficiency will be impacted by requiring the live testimony, subject to cross-examination, of witnesses before their prior statements will be considered by the Merit Board, aside from the general increased administrative burdens that would result. Further, the importance of maintaining appropriate discipline among police officers cannot be overstated; however, because Merit Board hearings take place only after termination,[7] there is no risk that an

---

[7] The General Assembly has amended KRS Chapter 67C, effective January 1, 2025, to require Merit Board hearings to take place prior to any disciplinary action being taken under certain circumstances. KY LEGIS 181 § 10 (2024), 2024 Kentucky

undisciplined employee will remain on the police force while awaiting his hearing and chance to cross-examine those witnesses whose statements have been submitted to the Merit Board.

While the expeditious removal of unsatisfactory employees is also a legitimate factor to consider, it weighs very little in this case. Certainly, the quick removal of an unsatisfactory police officer, whose duty it is to uphold and enforce laws, is vital. However, additional process at the Merit Board stage would do nothing to stand in the way of that expeditious removal. As previously stated, the Merit Board hearing does not occur until after the police officer is terminated and, therefore, does not impede a quick termination. Further, because the hearing takes place post-termination of employment, there would be no additional cost imposed on the state in terms of the officer's salary while awaiting a hearing, as there would be in the case of an officer suspended with pay pending his Merit Board hearing.

Finally, Metro Government asserts a governmental interest in the avoidance of administrative burdens. This is a real and significant interest that the United States Supreme Court has stated "must be weighed." *Id.* at 348 ("[T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed."). The additional requirement that LMPD call to testify every witness the PIU or PSU interviewed so that they can be cross-examined would greatly increase the

---

Laws Ch. 181 (HB 388). We make no holding regarding the weighing of the *Mathews* factors under the newly enacted legislation.

27

length of the Merit Board hearing. In the case at bar, for example, the hearing lasted four days even without LMPD calling those witnesses. It likely would have lasted several more if LMPD was forced to call an additional seven witnesses. That additional administrative cost and delay would result is obvious.

Aside from the interests Metro Government asserts, there are other public interests that must be considered. Society has an interest in assuring that Merit Board actions are correct and just. The cross-examination requirement for which Hardin advocates is one way in which that interest could be supported. Relatedly, society, LMPD, and the officer all share an "interest in avoiding disruption and erroneous decisions[.]" *Loudermill*, 470 U.S. at 544. Finally, "[a] governmental employer has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls." *Id.* This interest is further shared by the public at large.

*d. Weighing of the Mathews Factors*

In summary, there are significant interests to both the individual and the public that are at stake in deciding how much process is due a terminated police officer in front of the Merit Board. However, "[a]t some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews*, 424 U.S. at 348. Such is the weighing in the case at bar. The police officer's interests are high and so are the

28

public's interests. However, as previously explained, given the significant safeguards already provided by the General Assembly to officers in matters before the Merit Board, the risk of error is relatively low. Likewise, there is little probable value in increasing the safeguards in front of the Merit Board by requiring live testimony by witnesses with cross-examination prior to the admission of the witness's prior statement. Accordingly, we conclude that Hardin's Due Process rights were not violated when the Merit Board considered sworn, transcribed witness statements even though those witnesses were not called to testify at Hardin's hearing and therefore were not subject to cross-examination.

## D. Reliance on Arrest and Criminal Charges

Finally, Hardin argues that basing his termination on his arrest and criminal charges, absent a conviction, was inherently arbitrary. He asserts that non-final criminal charges can never be the basis of the termination of a merit-protected employee. Metro Government, on the other hand, argues that the Chief's termination of Hardin's employment was not based solely on the non-final criminal charges but instead was based on the facts underlying the incidents. It further argues that because the Merit Board did not uphold the Chief's finding of a violation of SOP based on the criminal charges, the issue is moot.

Regarding the Chief's finding that Hardin violated the SOP governing "Obedience to Rules and Regulations," the Chief's pre-termination notice letter to Hardin stated as follows:

You violated Standard Operating Procedure 5.1.2 <u>Obedience to Rules and Regulations</u> when your conduct led to your arrest on February 3, 2015. You were arrested for Assault 4th Degree, Official Misconduct 1st Degree (2 counts), False Swearing, Assault 1st Degree, and Wanton Endangerment 1st Degree. The above charges were brought against you regarding your interactions with two juveniles on two different occasions, January 22, 2015 and January 27, 2015 at Frederick Law Olmsted Academy North. The events leading to your arrest were captured on the school surveillance cameras. There is probable cause for your arrest for your actions concerning the above juveniles.

SOP 5.1.2, in turn, states,

Members of the LMPD shall not commit any act that constitutes a violation of any of the laws and ordinances applicable in their current respective location.

Members shall also obey all rules, orders, policies and procedures of the department. Members who violate any of the above may be dismissed or be subject to other punishment as directed for such a violation.

All members shall abide by the Standards of Ethical Conduct, located in the Louisville Metro Government Personnel Policies (Section 1.5). . . .

Finally, KRS 67C.321(1) says that "[a]ny officer may be removed, suspended for a period not to exceed thirty (30) days, laid-off, or reduced in grade by the chief **for any cause** which promotes the efficiency of the services . . .." (emphasis added).

None of the above quoted sources provide guidance as to the amount of evidentiary proof that the Chief must have in order to find a violation of an SOP. If we were to hold that the Chief could not terminate an employee for a violation of SOP 5.1.2 based on a violation of a law until that employee was formally convicted of the underlying offense, we would, in essence, be holding the Chief to a beyond a reasonable doubt standard of proof. Practically

30

speaking, a holding such as that requested by Hardin would also serve to prevent the Chief from finding a violation of this SOP for violation of a law until after a conviction, which, as is exemplified by this case, can take years. We refuse to require the Chief to either find a violation beyond a reasonable doubt or wait until a criminal conviction is final to find a violation. Probable cause that an employee has violated a law is sufficient to sustain a finding by the Chief of a violation of SOP 5.1.2.

We are further persuaded that the Chief's termination of Hardin and the Merit Board's subsequent upholding of that termination were not arbitrary because they were not based solely on Hardin's arrest and criminal charges.[8] There were other independent bases for his termination. In fact, a violation of SOP 5.1.2 was only one of four SOP violations found by the Chief, and the Merit Board, in fact, found no violation of this SOP "given the eventual exoneration and expungement of [Hardin's] criminal charges." Nevertheless, the Merit Board, after a hearing and deliberation, upheld the Chief's termination decision, and this was not arbitrary.

Accordingly, we hold that Hardin's termination was not arbitrary merely because the Chief found that he violated SOP 5.1.2 due to his arrest and criminal charges.

---

[8] This is the determinative distinguishing factor between the facts of Hardin's case and the facts of the Court of Appeals opinions, *Commonwealth, Transp. Cabinet v. Woodall,* 735 S.W.2d 335 (Ky. App. 1987), and *Vaden v. Louisville Civil Service Bd.,* 701 S.W.2d 150 (Ky. App. 1985), on which he heavily relies.

## III. CONCLUSION

For the above-stated reasons, we affirm the decision of the Court of Appeals.

VanMeter, C.J.; Conley, Keller, Lambert, Nickell and Thompson, JJ., sitting. VanMeter, C.J.; Lambert and Nickell, JJ., concur. Conley and Thompson, JJ., concur in result only by separate opinion. Bisig, J., not sitting.

CONLEY, J., CONCURRING IN RESULT ONLY: For the reasons expressed in my concurring opinion in the contemporaneously rendered decision of *Louisville/Jefferson Cnty. Metro. Gov. v. Dezmon Moore*, -- S.W.3d – (Ky. 2024), I conclude that LMPD violated the expungement statute by considering materials that ought to have been destroyed pursuant to that statute and a lawful court order. I also conclude Hardin had a Due Process right to confront the witnesses against him in person pursuant to the 14th Amendment of the federal constitution; Section 2 of the Kentucky constitution; and our holding in *Kaelin v. City of Louisville*, 643 S.W.2d 590, 592 (Ky. 1982). But I find the errors harmless because the videos of the incidents were recorded by the school; and were not, at that point, a criminal record or record "relating to the arrest, charge, or other matters arising out of the arrest or charge[.]" KRS 431.976(4). Therefore, the Merit Board would have had these videos as evidence, in spite of the expungement order in one of Hardin's cases. As such, there was substantial evidence supporting the Merit Board's decision.

THOMPSON, J., CONCURRING IN RESULT ONLY: While I agree that the majority is correct in its result, my reasoning differs from the majority opinion

32

in certain respects. I agree with the majority opinion that the Chief of Police for the Louisville Metro Police Department (LMPD) had the authority to terminate Hardin. This action was reasonable based on his improper conduct while he was engaged in his duties as an officer. Hardin argues that the Merits Board relied on his expunged criminal conviction in upholding his termination, but there is no evidence to support his supposition. Therefore, I agree that the Merits Board could properly uphold Hardin's termination on other grounds after the expungement of his conviction on one charge and acquittal on another charge.

I wish to clarify how the expungement process is supposed to take place when it comes to different governmental organizations. Unlike the Administrative Office of the Courts (AOC), which will simply expunge all criminal records upon receiving notice of an order of expungement, the LMPD did not have to sift through all of its internal records to locate all references to Hardin's criminal charges. Instead, its obligation was to redact its internal records before they were disclosed to outside third parties, such as in response to a Freedom of Information Act request.

The LMPD also needed to redact any references to that type of information contained in the Professional Standards Unit (PSU) file provided for the Merits Board's review of Hardin's termination. To the extent that the Merits Board received "records relating to" Hardin's "arrest charge, or other matters arising out of the arrest or charge" including his conviction, KRS 431.076(4), prior to the LMPD receiving notice of the order of expungement, it could not

33

rely on those records or put them into evidence to support its decision because, by operation of law, those events never occurred.

I disagree with Hardin that KRS 431.076(4) required all the PIU materials collected during the criminal investigation, including witness statements, had to be destroyed and not considered. An order of expungement erases the criminal process in its entirety, but what it cannot do is eradicate underlying facts and materials which could be used in support of a criminal proceeding, such as witness statements, videos, and investigatory records (although portions of such records may need to be redacted to remove references to the criminal process). Hardin's underlying conduct and the investigation of that conduct (which led to his criminal charge, prosecution and ultimate conviction) is not expunged; essentially, it is as if a potential crime was investigated, but never resulted in an arrest, an indictment or an ultimate resolution.

SOP 5.1.2 prohibits members of the LMPD from committing "any act that constitutes a violation of any of the laws and ordinances applicable in their current respective location[,]" requires them to "obey all rules, orders, policies and procedures of the department[,]" and to "abide by the Standards of Ethical Conduct[.]" The conduct underlying even an expunged or an acquitted charge could potentially still constitute a violation of SOP 5.1.2. Additionally, an acquittal (if it has not been expunged either through an order of expungement or automatically through operation of law, *see* KRS 431.076(1)(a)-(b)) means that a charge cannot be proven beyond a reasonable doubt; it does not mean a disciplinary charge based on that same conduct cannot be established by a

34

preponderance of the evidence. However, because the Merits Board ultimately found that there was no violation of SOP 5.1.2, I am not convinced that Hardin's expunged charge (despite his claims to the contrary) was actually considered by the Merits Board in its determination to uphold his termination.

Hardin has not established that the other three charges which formed a basis for the Merits Board to uphold his termination were used as a pretext to terminate him based on his expunged charge. Each of these grounds was supported by the conduct which formed the basis for his charges. Accordingly, the Merits Board's decision to uphold the Chief's termination was not arbitrary.

I also concur with the majority's determination that Hardin's due process rights were not violated when the LMPD did not call the witnesses to testify whose statements were submitted into evidence. I, however, write separately because I do not agree that much the well-written majority's analysis on this issue was necessary.

Having determined that the LMPD did not need to expunge witness statements from the PSU file, Hardin cannot argue that his right to cross examine witnesses was violated where it was previously disclosed to him that twelve witness statements would be placed into evidence and he could have subpoenaed all twelve under KRS 67C.325 but only chose to subpoena three. No one denied Hardin the ability to confront or cross-examine witnesses. Accordingly, there was no error. I would affirm the Court of Appeals' decision.

COUNSEL FOR APPELLANT:

David Lindsay Leightty
Priddy, Cutler, Leightty & Meade, PLLC

COUNSEL FOR APPELLEE, LOUISVILLE/JEFFERSON COUNTY
METROPOLITAN GOVERNMENT:

Mitchel Terence Denham
McBrayer, PLLC

Derek Miles
DBL Law

COUNSEL FOR APPELLEE, LOUISVILLE METRO POLICE MERIT BOARD:

Mark Wesley Dobbins
Joanne Lynch
Tilford Dobbins Schmidt PLLC

Kathleen M. Winchell Schoen